UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
JOHN PAOLELLA,

                        Plaintiff,

        -against-                          <u>MEMORANDUM & ORDER</u>
                                           13-CV-6447(JS)
CAROLYN W. COLVIN, Commissioner
of Social Security,[1]

                        Defendant.
-----------------------------------X
APPEARANCES
For Plaintiff:        Ronald L. Epstein, Esq.
                      Grey & Grey L.L.P.
                      360 Main Street
                      Farmingdale, NY 11735

For Defendant:        Arthur Swerdloff, Esq.
                      United States Attorney's Office
                      271 Cadman Plaza East, 7th Floor
                      Brooklyn, NY 11201


SEYBERT, District Judge:

        Plaintiff John Paolella ("Plaintiff") commenced this

action pursuant to the Social Security Act, as amended, 42 U.S.C.

§ 405(g), challenging defendant Commissioner of Social

Security's (the "Commissioner" or "Defendant") denial of his

application for Social Security Disability Benefits. Currently

pending before the Court are the Commissioner's motion for

judgment on the pleading and Plaintiff's cross-motion for the

same. For the following reasons, the Commissioner's motion is

GRANTED and Plaintiff's motion is DENIED.

_____

[1] The Clerk of the Court is directed to note that Carolyn W.
Colvin is now the acting Commissioner of Social Security.

On June 27, 2011, Plaintiff applied for disability insurance benefits asserting that he was disabled and unable to work as of October 27, 2010, due to a bilateral shoulder sprain, right knee sprain, and neuropathy. (R. 134-35, 191.) [2] His application was denied on August 19, 2011. (R. 78-89.) Plaintiff then requested a hearing and, on May 10, 2012, appeared with counsel and testified before Administrative Law Judge ("ALJ") Bruce MacDougall. (R. 37-59, 90-91, 98.) By decision dated June 18, 2012, ALJ MacDougall found that Plaintiff was not disabled. (R. 22-34.)

Plaintiff sought an appeal before the Appeals Council and submitted additional evidence in support of his request. (R. 6, 18-19.) On September 24, 2013, the Appeals Council denied Plaintiff's request for review, and consequently, the ALJ's decision became the final decision of the Commissioner. (R. 1-4.)

The Court's review of the administrative record will proceed as follows: first, the Court will summarize the relevant evidence that was before the ALJ; second, the Court will review the ALJ's findings and conclusions; third, the Court will summarize the additional evidence submitted to the Appeals

---

[2] "R." denotes the administrative record which was filed by the Commissioner on March 21, 2014. (Docket Entry 8.)

Council; and _finally_, the Court will review the Appeals Council's decision.

I.  <u>Evidence Presented to the ALJ</u>

    A.  <u>Non-Medical Evidence</u>

    Plaintiff was born in 1973, and completed two years of college and the fire academy. (R. 134, 191-92.) From October 1997 through August 2007, Plaintiff worked as a firefighter for the Fire Department of New York. (R. 152, 192.) As a firefighter, he extinguished fires, worked on an Engine Company and Ladder Company, did medical runs, climbed flights of stairs, and carried and operated equipment. (R. 41, 159.) In 2004, Plaintiff injured his right knee stepping off of a fire truck. (R. 217.) He was diagnosed with an anterior cruciate ligament ("ACL") tear and underwent reconstructive surgery. (R. 42, 217.) Plaintiff recovered and went back to full duty six months post-operation. (R. 218-223.) Plaintiff reinjured this knee in July 2010, but his symptoms were acceptable for daily living. (R. 238, 240.)

    In 2007, Plaintiff was promoted to fire marshal and remained as such until October 27, 2010, his alleged onset date of disability. (R. 41, 60, 152, 191-92.) Plaintiff's duties as a fire marshal required him to investigate fires by examining debris, collecting evidence, rearranging furniture to recreate conditions, arresting suspects, and writing reports. (R. 41,

159.)  During one of his investigations in 2009, he was moving a china cabinet that crumbled and fell on him, causing injury to his left shoulder.  (R. 224.)  Three months after this incident, Plaintiff underwent surgery.  (R. 227-29.)

Plaintiff received a medical assessment for Social Security on May 20, 2011.  (R. 299.)

1.  <u>Function Report of July 5, 2011</u>

Plaintiff resides in a house with his family. (R. 50.)  He has no problems with personal care.  (R. 181.)  His daily activities include eating, showering, dressing, and watching television.  (R. 181.)  Plaintiff does not prepare his own meals because his wife does it.  (R. 182.)  There has been no change in his ability to handle his money.  (R. 184.)  He takes care of his children by feeding them and driving them to practice or wherever necessary.  (R. 181.)  He goes out a few times a day, is able to go alone and drive a car, and he attends his children's sports events once or twice a week.  (R. 183, 185.)  He has no problems paying attention and following written and spoken instructions.  (R. 187.)

Plaintiff does not do house or yard work due to his shoulder and knee pain.  (R. 183.)  He also has no hobbies or interests because of his injuries, but he does go out to dinner and watch sports approximately once a month.  (R. 184-85.)  He does his shopping online.  (R. 184.)

2.  <u>Plaintiff's Testimony to the ALJ</u>

At the hearing on May 10, 2012, Plaintiff testified that he has a prescribed knee brace, but does not wear it as his doctor told him that it is no longer necessary.  (R. 43-44.) Plaintiff also stated he does not take his prescribed Flexeril and Mobic because they make him drowsy, and instead constantly takes Aleve and Motrin.  (R. 44.)  Plaintiff explained that he has lost strength in his left shoulder and feels pain if he lifts more than ten pounds or carries something too heavy.  (R. 45-46, 54.)

Plaintiff further testified that he has extreme numbness in his hands and feet when he uses them.  (R. 49.)  His hands go numb when he drives, talks on the phone, and uses a screwdriver, and Plaintiff believes that they would go numb if he was to use a computer.  (R. 49-50.)  He does not do much around the house because he hires people and he has his wife and son to help.  (R. 51.)  He does not think he could keep a job because he would have to take too many days off and breaks.  (R. 51.)

According to Plaintiff, his swelling in the knee causes constant pain and he can sit for ten minutes before having to elevate his leg.  (R. 52-53.)  If he stands longer than five minutes, his knee will start to hurt.  (R. 53.) Plaintiff spends most of his time during the day on a recliner

with his legs elevated.  (R. 54.)  On a scale from one to ten, Plaintiff rated his knee pain a five or six in intensity.  (R. 56.)

B.   Medical Evidence

1.   Dr. Anne M. Kelly, MD (Prior to Alleged Onset Date)

On June 18, 2004, Dr. Kelly had an initial orthopedic consultation with Plaintiff after Plaintiff complained of right knee pain and swelling from a misstep off a fire truck.  (R. 217.)  Dr. Kelly diagnosed Plaintiff with an ACL tear and medial meniscus, and discussed ACL reconstruction.  (R. 217.)  On June 30, 2004, Plaintiff underwent ACL reconstruction surgery.  (R. 244-46.)  Dr. Kelly saw Plaintiff for several post-operative and follow-up visits, and with each visit Dr. Kelly noted improvement.  (R. 218-23.)  In fact, eight months post-operation, Dr. Kelly noted that Plaintiff was doing very well and had been on full duty for two months.  (R. 223.)

On April 27, 2009, Dr. Kelly saw Plaintiff for a new problem--a left shoulder injury, including pain and numbness down his arm.  (R. 224.)  Plaintiff had no pain at ninety degrees of abduction and no posterior pain with the O'Brien maneuver, but had tenderness at the AC joint that increased with adduction and pain up top consistent with AC separation.  (R. 224.)  The magnetic resonance imaging ("MRI") that Dr. Kelly

examined showed some anterior labral detachment inferiorly, though the doctor concluded that there was no labral tearing. (R. 224.) As a result of this consultation, Dr. Kelly advised decreased activity for another three weeks, discontinuance of physical therapy because it was not helping, aggressive icing, and continued use of Naprosyn. (R. 224.)

Plaintiff returned for a follow up visit on May 18, 2009, and reported pain with activity and intermittent hand numbness. (R. 225.) Dr. Kelly saw Plaintiff for several more follow-up visits to determine the success of the non-operative treatment. (R. 225-27.) An injection of Lidocaine, Marcaine, and Depo into the AC joint caused discomfort; pain remained at the top, and with movement and exercise; and there was no decrease in tenderness. (R. 225-27.) Accordingly, Dr. Kelly recommended and scheduled Plaintiff for left shoulder surgery.[3] (R. 227.)

The operation proceeded on August 5, 2009. (R. 241.) The postoperative diagnosis was impingement, acromioclavicular arthrosis, and glenoid chondral defect. (R. 241.)

Plaintiff's first post-operation visit for his left shoulder took place on August 14, 2009. (R. 229.) Plaintiff

_____

[3] Before Plaintiff underwent left shoulder surgery, Dr. Kelly reviewed an MRI of Plaintiff's right shoulder. (R. 228.) The MRI showed a low lying acromion and some virtual sided tearing. (R. 228.) However, Dr. Kelly saw no indication for surgery. (R. 228.)

had almost 120 degrees of forward flexion before feeling discomfort. (R. 229.) At Plaintiff's second visit, he still had "pretty good" motion and no pain until 120 degrees of forward elevation and no pain with external rotation at the side. (R. 230.) He did have pain, however, with abduction at seventy degrees and cross-chest adduction at neutral. (R. 230.) Dr. Kelly directed Plaintiff to use ice, and continue with Mobic and therapy. (R. 230.) Dr. Kelly's directives continued through two other follow-up visits. (R. 231-32.)

Five months after his surgery, Plaintiff was doing "fairly well." (R. 233.) He had good motion but some lingering deep pain. (R. 233.) He felt discomfort at about 110 degrees of forward flexion and could passively obtain full forward flexion and abduction. (R. 233.) Internal rotation was still off. Therapy was discontinued. (R. 233.)

On February 22, 2010, Plaintiff saw Dr. Kelly for another follow-up visit. (R. 234.) Plaintiff experienced pain with the last thirty degrees of forward flexion and pain with more than thirty degrees of crossed chest adduction. (R. 234.) There was no pain with abduction or with external rotation, but some limitation of internal rotation. (R. 234.) Plaintiff restarted therapy, Mobic and icing. (R. 234.) Plaintiff's pain continued at another follow-up visit a month later where he had full forward flexion pain beyond ninety-five degrees, full

abduction to ninety degrees with pain at ninety and thirty degree external rotation. (R. 235.)

On April 5, 2010, Dr. Kelly examined Plaintiff's right knee and shoulders. (R. 236-37.) At this visit, his right knee had intermittent tenderness consistent with intermittent patellar tendinitis that he "dealt with very well and [had] been able to work through." (R. 237.) His right shoulder had pain with activities overhead. (R. 237.) His left shoulder had pain beyond ninety degrees forward flexion, abduction pain at ninety degrees, and internal rotation was off. (R. 237.) Dr. Kelly determined that Plaintiff was not a candidate to return to full duty. (R. 237.)

In July 2010, Plaintiff reinjured his right knee. (R. 238.) However, Dr. Kelly later concluded that Plaintiff's symptoms were acceptable for daily living. (R. 240.)

2. <u>Dr. Aurene C. Alcasabas MD, D-FP, F.A.A.F.P.</u>
   <u>(After the Alleged Onset Date)</u>

Dr. Alcasabas, a family practitioner, filled out a Medical Assessment Questionnaire ("MAQ") regarding Plaintiff in May 2011. (R. 282-86.) Dr. Alcasabas diagnosed Plaintiff with bilateral shoulder pain, right knee pain, and numbness/neuropathy of hands and legs. (R. 282.) She also noted that Plaintiff was referred to South Shore Neurology for further evaluation and treatments. (R. 282.) She identified

Plaintiff's symptoms as extremity pain and numbness, difficulty walking, and muscle weakness. (R. 282.) She noted Plaintiff's medications as Mobic and Flexeril, which caused Plaintiff drowsiness. (R. 283.) She also indicated that Plaintiff's pain and symptoms were constantly severe enough to interfere with attention and concentration, and that Plaintiff had a slight limitation dealing with work stress. (R. 283-84.)

She further indicated that Plaintiff could only walk one or two city blocks, sit for ten minutes, and stand for five minutes at one time. (R. 284.) She opined that Plaintiff would require a job that permitted Plaintiff to shift from sitting, standing, or walking at will. (R. 284.) She also indicated that Plaintiff would need to take unscheduled breaks every fifteen minutes during an eight-hour work day. (R. 285.) Plaintiff does not need assistive devices, but can only lift and carry less than ten pounds occasionally. (R 285.) She indicated that Plaintiff would have significant limitations in doing repetitive reaching, handling or fingering, but found that he could use his hands and fingers for grasping, turning, twisting, and fine manipulations 100 percent of the time. (R. 285.) Plaintiff could also twist and bend at the waist 100 percent of the time. (R. 286.) Dr. Alcasabas opined that Plaintiff's impairments would cause him to be absent more than three times a month. (R. 286.)

Dr. Alcasabas later requested a neurologic consultation for Plaintiff. (R. 300.)

### 3. Dr. Hugh Xian, MD PhD

At the referral from Dr. Alcasabas, Dr. Xian saw Plaintiff for a neurologic consultation on June 22, 2011 for progressive paresthesia in his hands and feet. (R. 260.) Dr. Xian's neurological examination of Plaintiff revealed that Plaintiff's motor strength was a "5/5 in the bilateral upper and lower extremity except the limited exam for bilateral deltoid." (R. 261.) There was a decreased pinprick sensation in the right upper and right lower extremity in multi-dermatome distribution, and mild decreased vibration sensation in both lower extremities. (R. 261.) As for reflexes, there was 1+ bilateral biceps, trace triceps, 2+ left knee jerks, diminished right knee jerk, and 1+ to 2+ bilateral ankle jerks. (R. 261.) Plaintiff's toes were downgoing bilaterally, and his gait was steady. (R. 261.)

Plaintiff's differential diagnoses included progressive paresthesia in his hands and feet associated with hand weakness, polyneuropathy, and radicular dysfunction. (R. 261.) Dr. Xian did not exclude cerebal structure abnormality including demyelinating lesion from his diagnosis. (R. 261.) He did rule out, however, cervical spondylosis disc disease and spinal stenosis. (R. 261.) Dr. Xian recommended a brain MRI and electromyography ("EMG") nerve conduction study. (R. 261.)

11

The EMG study was conducted on June 30, 2011, and was consistent with mild-to-moderate right Carpal Tunnel Syndrome ("CTS"). (R. 263-67.)

On October 18, 2011, Plaintiff returned to Dr. Xian. (R. 258.) The neurologic examination on this visit was nearly identical to the June 22, 2011 visit. (R. 258-59.) After reviewing the EMG and MRI studies, Dr. Xian diagnosed Plaintiff with mild-to-moderate right CTS and cervical degenerative disease. (R. 259.) Dr. Xian recommended that Plaintiff continue use of a wrist splint, and if that failed to help, he would recommend a surgical evaluation. (R. 259.) In addition, Dr. Xian recommended that Plaintiff complete an EMG study of the left upper extremity to rule out entrapment neuropathy and cervical radiculopathy. (R. 259.)

### 4. Dr. Andrea Pollack, DO

Plaintiff was referred to Dr. Pollack by the Division of Disability Determination for an internal medicine examination. (R. 251.) Dr. Pollack performed an examination of Plaintiff on August 11, 2011. (R. 251.) Plaintiff's complaint included his bilateral shoulder pain, his right knee pain, and hand numbness.[4]

---

[4] Plaintiff also stated that he was diagnosed with an enlarged prostate that resulted in increased frequency and urgency of urination, and high blood pressure. (R. 251.) However, on May 10, 2012, Plaintiff testified that his prostate and high blood pressure did not affect his daily living and were no longer an issue. (R. 48.)

(R. 251.) Plaintiff rated his bilateral shoulder pain as sharp and constant with a 1/10 to 2/10 intensity, his knee pain as sharp and constant with a 3/10 to 4/10 intensity, and his hand numbness as constant pain that worsened at night. (R. 251.) The examination report noted that Plaintiff did not cook, clean, do laundry, or shop because his wife does it, but that he does shower, dress himself, watch television, listen to the radio, read, go out, and care for his children. (R. 252.)

Dr. Pollack noted that Plaintiff had no acute distress, a normal gait, a normal stance, pain when walking on his heels, and the ability to squat halfway down. (R. 252.) In addition, he did not use assistive devices, did not need help changing for the exam or getting on and off the exam table, and was able to rise from the chair without difficulty. (R. 252.)

Dr. Pollack further noted that Plaintiff's forward elevation/abduction was 110 degrees on the left and 130 degrees on the right. (R. 253.) Bilaterally, Plaintiff's adduction was thirty degrees and internal rotation was forty degrees. (R. 253.) Plaintiff's external rotation was fifty degrees on the left and sixty degrees on the right. (R. 253.) As for Plaintiff's right knee, he was able to flex to 130 degrees. (R. 253.) Plaintiff's joints were stable and nontender, and there was no indication of redness, heat, swelling, or effusion. (R. 253.) Plaintiff's sensation was intact in the hands, and his

strength was a 5/5 in the upper and lower extremities. (R. 253.) Plaintiff's hand and finger dexterity was intact and his grip strength was a 5/5 in both hands. (R. 254.)

Dr. Pollack diagnosed Plaintiff with <u>inter</u> <u>alia</u> bilateral shoulder pain, right knee pain, and CTS. (R. 254.) He determined that Plaintiff's prognosis was fair and he also determined that Plaintiff had mild to moderate restriction in lifting, carrying, pushing, pulling, reaching, squatting, kneeling, climbing stairs, and walking. (R. 254.)

5. <u>Dr. Philip Schrank L., MD</u>

Dr. Schrank, an orthopedist, examined Plaintiff's right knee on October 12, 2011. (R. 278-79.) Dr. Schrank's examination of the right knee revealed "moderate effusion, tenderness over medial patellar facet, tenderness over lateral patellar facet, [n]o tenderness over inferior pole of patella, tenderness over superior pole of the patella, PM joint line tenderness and PL joint line tenderness." (R. 279.) Plaintiff's flexion was limited to 130 degree and his coordination was normal. (R. 279.) Regarding his knee stability, there was "[n]o MCL laxity at 30 degrees of knee flexion, no pain with valgus stress testing, no LCL laxity at 30 degrees of knee flexion, no pain with varus stress testing, negative Lachman test, negative anterior drawer test and negative posterior drawer test." (R. 279.) Plaintiff had full

strength and tone in his quadriceps and hamstrings. (R. 279.)
Dr. Schrank found nothing wrong with the left knee. (R. 279.)

As a result of the examination, Dr. Schrank believed
Plaintiff to have early arthritic change in the knee and he
recommended Euflexxa injections. (R. 279.)

## II. The ALJ's Decision

After reviewing all of the above evidence, the ALJ
rendered his decision on June 18, 2012, finding that Plaintiff
was not disabled. (R. 25-31.) The ALJ concluded that while
Plaintiff's "medically determinable impairments could reasonably
be expected to cause some of the alleged symptoms[,] . . . [his]
statements concerning the intensity, persistence and limiting
effects of these symptoms are not persuasive to the extent they
are not supported by the objective medical evidence in the
record, particularly the findings reported on clinical
examinations by Dr. Pollack and Dr. Xian." (R. 29.) The ALJ
also concluded that the opinion evidence of Dr. Alcasabas was
"unsupported by any objective medical findings and is
contradicted by substantial evidence in the record" in the form
of Dr. Pollack's opinion that was "well-supported by objective
medical findings, as evidenced in a very thorough report of
physical examination." (R. 29.) Further, the ALJ gave less
weight to the portion of Dr. Alcasabas's opinion regarding
Plaintiff's "ability to sit, stand and walk; lift/carry and to

maintain attention/concentration" than "that of Dr. Pollack . . .
who supported her opinion with clinical examination findings."
(R. 30.)

The ALJ found that although Plaintiff was unable to
perform his past relevant work as a firefighter and fire marshal,
there are a number of jobs that exist in the national economy
that Plaintiff could perform.  (R. 30.)

III.  Additional Evidence Submitted to the Appeals Council

On November 18, 2011, Plaintiff returned to Dr.
Schrank for his third injection in a series of three Euflexxa
injections for his right knee.  (R. 306.)  The physical
examination results of Plaintiff were identical to the exam
performed on October 12, 2011.  (R. 280, 306-07.)  Plaintiff
then underwent an EMG/nerve conduction study on November 21,
2011, for evaluation of left CTS versus cervical radiculopathy.
(R. 315.)  The study revealed mild to moderate CTS that did not
result in any significant motor axonal degeneration and ruled
out left cervical radiculopathy.  (R. 316.)

Dr. Schrank sent Plaintiff for an MRI arthogram to
further evaluate the integrity of the knee, which he underwent
on January 5, 2012.  (R. 310, 314.)  The arthogram demonstrated
ACL reconstruction without evidence of tear or degeneration of
graft material, moderate focal chondromalacia over the medial
patellar facet, and chondral fissures extending up to fifty

percent of cartilage thickness. (R. 310-11.) The MRI demonstrated previous ACL reconstruction, no recurrent tear or meniscal tear, mild scarring, an intact posterior cruciate ligament, minimal widening of the tibial tunnel with no cyst formation, intact collateral ligaments and distal poplieteus tendons, preservation of articular cartilage, no joint line osteophytes, moderate chondromalacia, twenty percent loss of chondral thickness, chondral fissures extending approximately fifty percent cartilage thickness (remainder of cartilage preserved), mild thickening and slight irregularity of the joint synovlum suggesting synovitis, dense arthrofibrosis, moderate degeneration of patellar tendon at the previous graft site, no patellar tendon tear, and an intact quadriceps tendon. (R. 312.) Plaintiff returned to Dr. Schrank on January 23, 2012, for a review of his right knee MRI. (R. 308.) Dr. Schrank's review showed mild cartilage damage on the undersurface of the patella, and intact tendons and ligaments. (R. 309.) Plaintiff's physical exam results remained unchanged from the previous visit. (R. 308-09, 313-14.)

IV. <u>Decision of the Appeals Council</u>

The Appeals Council denied Plaintiff's appeal of the ALJ's determination, stating that they "found no reason under [the] rules to review the Administrative Law Judge's decision."

(R. 1.)   Thus, the ALJ's decision is considered the final decision of the commissioner.  (R. 1.)

## DISCUSSION

Plaintiff commenced this action on November 21, 2013. (Docket Entry 1.)  The Commissioner filed her answer on March 21, 2014.  (Docket Entry 9.)  On August 6, 2014, the Commissioner moved for judgment on the pleadings (Docket Entry 12), and on September 5, 2014, Plaintiff cross-moved for judgment on the pleadings.  (Docket Entry 15.)

The Court will first review the applicable legal standard before turning to the parties' motions more specifically.

## I. Standard of Review

In reviewing the ruling of the ALJ, this Court will not determine de novo whether Plaintiff is entitled to SSI or disability benefits.  Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ.  See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  Instead, this Court must determine whether the ALJ's findings are supported by "substantial evidence in the record as a whole or are based on an erroneous legal standard."  Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (internal quotations marks and citation omitted), superseded by statute on other grounds, 20 C.F.R. § 404.1560(c)(2).  If the Court finds that

substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists. See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support a conclusion." Id. (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). The substantial evidence test applies not only to the ALJ's findings of fact, but also to any inferences and conclusions of law drawn from such facts. See id.

To determine if substantial evidence exists to support the ALJ's findings, this Court must "examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotation marks and citation omitted). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g).

II.  Eligibility for Benefits

A claimant must be disabled within the meaning of the Social Security Act (the "Act") to receive SSI or disability benefits. See Byam v. Barnhart, 336 F.3d 172, 175 (2d Cir. 2003); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); 42 U.S.C. §§ 423(a)(1)(A), 1381a. A claimant is disabled under the

Act when he can show an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The claimant's impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner must apply a five-step analysis when determining whether a claimant is disabled as defined by the Act. See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Petrie v. Astrue, 412 F. App'x 401, 404 (2d Cir. 2011). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). Second, the claimant must prove that she suffers from a severe impairment that significantly limits her mental or physical ability to do basic work activities. Id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Third, the claimant must show that her impairment is equivalent to one of the impairments listed in Appendix 1 of the Regulations. Id. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Fourth, if her impairment or its equivalent is not listed in the Appendix, the claimant must show that she

does not have the residual functional capacity to perform tasks required in his previous employment. Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Fifth, if the claimant successfully makes these showings, the Commissioner must determine if there is any other work within the national economy that the claimant is able to perform. Id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The claimant has the burden of proving the first four steps of the analysis, while the Commissioner carries the burden of proof for the last step. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009). "In making the required determinations, the Commissioner must consider: (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, his family, and others; and (4) the claimant's educational background, age, and work experience." Boryk ex rel. Boryk v. Barnhart, No. 02-CV-2465, 2003 WL 22170596, at *8 (E.D.N.Y. Sept. 17, 2003) (citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)).

In the present case, the ALJ performed the above analysis. He found that Plaintiff had not been engaged in substantial gainful activity since October 27, 2010, and that his right knee and bilateral shoulder internal derangements constituted severe impairments that limited his capacity to work.

(R. 27.) The ALJ determined that neither Plaintiff's impairments nor a medical equivalent were among those enumerated in Appendix 1 and also determined that Plaintiff was incapable of performing any past relevant work. (R. 27, 30.) The ALJ found, however, that Plaintiff had the residual functional capacity to perform the full range of sedentary work. (R. 28-30.)

The Court must determine whether this final decision is supported by substantial evidence. With respect to the evidence submitted to the Appeals Council, it is deemed part of the record and will be considered by the Court when determining if there is substantial evidence to support the Commissioner's final decision. See Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) ("When the Appeals Council denies review after considering new evidence, we simply review the entire administrative record, which includes the new evidence, and determine, as in every case, whether there is substantial evidence to support the decision of the Secretary.").

Here, Defendant asserts that the ALJ correctly found that Plaintiff was not disabled, that his decision is supported by substantial evidence, and that it should be affirmed. Defendant further asserts that the evidence submitted to the Appeals Council does not warrant remand. Plaintiff argues that the ALJ erred in finding that Plaintiff was not disabled because

he: (1) improperly failed to give controlling weight to the treating physician's report; and (2) improperly rejected the credibility of claimant's complaints about pain and the extent of his impairments. Plaintiff also maintains that Defendant's motion should be denied because "the administration has improperly evaluated the medical evidence." (Pl.'s Br., Docket Entry 15-1, at 17.)

A.  Treating Physician Rule

Plaintiff argues that the ALJ failed to give controlling weight to Dr. Alcasabas's reports, which, as he argues, is supported by the clinical and diagnostic record. The Court disagrees that the ALJ erred in this regard.

According to the treating physician rule, the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight." Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Specifically, the regulations state:

> Generally, we give more weight to opinions from your treating sources . . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). When an ALJ does not accord controlling weight to the medical opinion of a treating physician, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004) (citation omitted); see also Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). Such factors include:

> (1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist.

Schnetzler, 533 F. Supp. 2d at 286 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Halloran, 362 F.3d at 32).

Additionally, the ALJ is required to provide "'good reasons' for the weight she gives to the treating source's opinion." Halloran, 362 F.3d at 32-33; see also Pagan v. Apfel, 99 F. Supp. 2d 407, 411 (S.D.N.Y. 2000) ("At the very least, the Commissioner must give express recognition to a treating source's report and explain his or her reasons for discrediting such a report."). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for remand." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

Here, the ALJ rejected Dr. Alcasabas's opinion that Plaintiff could "sit less than 2 hours and stand/walk less than two hours in an 8-hour workday; lift/carry less than 10 pounds and that he experiences pain, which constantly interferes with his ability to maintain attention and concentration," because it is unsupported by any objective medical findings and contradicted by substantial medical evidence, particularly Dr. Pollack's well-supported findings. (R. 29.)

The Court finds that the ALJ's decision to give limited weight to Dr. Alcasabas's opinion is supported by substantial evidence. First, Dr. Alcasabas's opinion proscribing all reaching overhead is inconsistent with Plaintiff's own testimony. Specifically, ALJ MacDougall noted Plaintiff's testimony that he has pain only when lifting above shoulder level. (R. 30.) Moreover, the ALJ noted that Dr. Alcasabas's own statements and findings were inconsistent. (R. 30 ("Moreover, the doctor's statements that the claimant can walk 1-2 city blocks without rest and that he needs to include periods of walking around during the workday are inconsistent with his assessment that the claimant can stand 0-5 minutes at one time and stand/walk less than 2 hours during an 8-hour workday.").) "[T]he Second Circuit has stated that it is entirely appropriate to give a treating physician's opinion less weight when it is internally inconsistent." Sisto v. Colvin, No.

12-CV-2258, 2013 WL 4735694, at *9 (E.D.N.Y. Sept. 3, 2013) (citing Micheli v. Astrue, 501 F. App'x 26, 28 (2d Cir. 2012)).

Second, the ALJ found that there was no objective medical support for Dr. Alcasabas's opinion that Plaintiff needs to shift positions at will. (R. 30.) Indeed, Dr. Pollack's findings support the opposite. Dr. Pollack's examination revealed, inter alia, that Plaintiff was in no acute distress, had a full range of motion in the cervical and lumbar spine, "shoulder elevation/abduction was 110 degrees on the left and 130 on the right and . . . [r]ight knee flexion was 130 degrees and range of motion in the left knee was full." (R. 29.) Ultimately, Dr. Pollack assessed mild to moderate restrictions. (R. 29.) On the other hand, Dr. Alcasabas's assessment of a constant need to shift positions and ongoing pain suggests significant limitations.[5]

As such, Plaintiff's motion regarding the treating physician rule is DENIED and insofar as Defendant maintains that

---

[5] Notably, Dr. Pollack's findings are more consistent with those of Dr. Kelly than Dr. Alcasabas. For example, Dr. Kelly's last physical exam of Plaintiff on October 1, 2010, indicated no persistent effusion, intermittent pain, and right IT band tendinitis, symptoms which she concluded were acceptable for daily living. (R. 240.) Dr. Kelly's final exam of Plaintiff does not indicate a condition severe enough to support Dr. Alcasabas's conclusions that Plaintiff can only sit for ten minutes, stand for five minutes, walk one to two city blocks before resting, sit and stand for less than two hours in an eight-hour workday, or walk every ten minutes for five minutes, or is required to elevate his leg seventy-five percent of the time. (R. 282-86.)

the ALJ's decision is supported by substantial evidence, the Court agrees in this regard and Defendant's motion is GRANTED.

B. <u>Plaintiff's Credibility</u>

Plaintiff also argues that the ALJ improperly rejected the credibility of Plaintiff's complaints of pain and his non-exertional impairments. The Court disagrees.

"It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant," and the Court will uphold the ALJ's decision to discredit a claimant's testimony so long as the decision is supported by substantial evidence. <u>Aponte v. Sec'y, Dep't of Health & Human Servs.</u>, 728 F.2d 588, 591 (2d Cir. 1984) (second alteration in original) (internal quotation marks and citation omitted). Here, Plaintiff's testimony and function report regarding his complaints of pain and the extent of his impairment are contradicted by evidence in the record. (<u>Compare</u> R. 55 (Plaintiff testifying that he drops something "every once and a while") <u>with</u> R. 294-95. (Dr. Xian noting Plaintiff's upper extremities' strength is 5/5)). Indeed, ALJ MacDougall specifically noted that Plaintiff's complaints contradicted the objective medical evidence from Drs. Pollack and Xian.

In addition, Plaintiff's testimony contradicts the function report he prepared. (<u>Compare</u> R. 50 (Plaintiff

testifying that his hands go numb if he actually uses them "for any amount of little time") with R. 185-86 (Plaintiff noting in the function report that his hands are "fine"); compare R. 54-55 (Plaintiff testifying that his ability to concentrate is impaired because the hand numbness prevents him from sleeping) with R. 187-88 (Plaintiff noting in the function report that he can follow written and spoken instructions, has no trouble remembering things, and has no problem paying attention)). Such contradictions constitute substantial evidence supporting the ALJ's decision to discount his testimony. See, e.g., Vargas v. Astrue, No. 10-CV-6306, 2011 WL 2946371, at *15 (S.D.N.Y. July 20, 2011); Shriver v. Astrue, No. 07-CV-2767, 2008 WL 4453420, at *2 (E.D.N.Y. Sept. 30, 2008).

Thus, Plaintiff's motion is DENIED and Defendant's motion is GRANTED in this regard.

C. Consideration of Additional Evidence Submitted to the Appeals Council

The Court has also reviewed the new evidence submitted to the Appeals Council and agrees with Defendant that such evidence does not warrant remand.

The new evidence submitted consisted of follow-up visits that Plaintiff had with Dr. Schrank and Dr. Xian. Dr. Xian colleague's impression was mild-to-moderate CTS, (R. 316), and Dr. Schrank's examination of Plaintiff indicated that

Plaintiff was still in pain and had tenderness, (R. 313-14), which is entirely consistent with the record and would not have influenced the ALJ's decision. See Adesina v. Astrue, No. 12-CV-3184, 2014 WL 5380938 at *14 (E.D.N.Y. Oct. 24, 2014) (citations omitted) ("Additional evidence submitted after an ALJ's determination must be both relevant to the claimant's condition during the time period for which benefits were denied, and present a reasonable possibility that [it] would have influenced the [ALJ] to decide the claimant's application differently." (internal quotation marks omitted)).

As such, Defendant's motion is GRANTED in this regard.

D. <u>Hand and Foot Numbness</u>

Finally, Plaintiff asserted in a single sentence--without any legal argument or support--that the ALJ failed to evaluate whether Plaintiff's bilateral hand and foot numbness were severe. (Pl.'s Br. at 10.) In fact, the Court takes this opportunity to note that Plaintiff's memorandum of law in support of the cross-motion and in opposition to Defendant's motion is far from a model of clarity. Not only does it violate the undersigned's individual rules, but the formatting is wholly inconsistent and the introduction to the argument section does not harmonize with the actual introduction section. See Seybert Ind. Rules IV(C)(2) (requiring that briefs are double-spaced with no more than twenty-three lines per page). In any event,

the Court finds that any failure by the ALJ to consider the severity of Plaintiff's bilateral hand and foot numbness was a harmless error.

In evaluating Plaintiff's impairment at step three of the analysis, ALJ MacDougall determined that Plaintiff suffered from the following severe impairments: right knee and bilateral shoulder internal derangements. (R. 27.) He also found that Plaintiff's prostate problems and high blood pressure did not constitute severe impairments. (R. 27.) He did not mention neuropathy or numbness during that step.

ALJ MacDougall then continued his analysis and specifically considered Plaintiff's hand and foot numbness in the subsequent steps. For example, he considered Plaintiff's ability to perform fine and gross movements, and explicitly referred to Dr. Alcasabas' records, amongst other medical evidence. (R. 27-29.) The ALJ's opinion includes a clear discussion of Plaintiff's complaints of carpel tunnel syndrome and numbness as well as studies and medical records concerning his ability to grasp objects and use his fingers. (R. 29.)

The ALJ must consider all impairments whether severe or not. See Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995) ("[T]he combined effect of a claimant's impairments must be considered in determining disability; the SSA must evaluate their combined impact on a claimant's ability to work,

regardless of whether every impairment is severe."). Thus,
where, as here, the ALJ has taken into account all of
Plaintiff's impairments regardless of their severity in the
subsequent steps of his evaluation, an error at step three is
harmless. Trimm v. Colvin, No. 13-CV-0138, 2014 WL 2510600, at
*6 (N.D.N.Y. June 4, 2014) ("Several courts conclude that when
an administrative law judge identifies some severe impairments
at Step 2 [in a three step process], and then proceeds through
subsequent sequential evaluation on the basis of combined
effects of all impairments, including those erroneously found to
be nonsevere, an error in failing to identify all severe
impairments at Step 2 is harmless." (emphases in original)
(citations omitted)); accord Snyder v. Colvin, No. 13-CV-0585,
2014 WL 3107962, at *5 & n.11 (N.D.N.Y. July 8, 2014)
(collecting cases); see Reices-Colon v. Astrue, 523 F. App'x 796,
798 (2d Cir. 2013) ("Because these conditions were considered
during the subsequent steps, any error was harmless."); Warren v.
Astrue, No. 10-CV-0500S, 2012 WL 32971, at *4 (W.D.N.Y. Jan. 6,
2012) (finding harmless error where the ALJ adjusted Plaintiff's
RFC based on her impairments); Haskins v. Comm'r of Soc. Sec.,
No. 05-CV-0292, 2008 WL 5113781, at *5 (N.D.N.Y. Nov. 25, 2008)
(finding harmless error although ALJ failed to consider whether
certain conditions were serious impairments because he
considered those conditions in subsequent steps of the analysis).

Accordingly, insofar as Plaintiff seeks to move on this ground, his motion is DENIED.

CONCLUSION

For the foregoing reasons, Plaintiff's motion is DENIED, the Commissioner's motion is GRANTED, and the decision of the ALJ is hereby AFFIRMED.

The Clerk of the Court is directed to note Carolyn W. Colvin as the acting Commissioner of Social Security on the docket and to mark this matter CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     December __1__, 2014
           Central Islip, NY